## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

AMERICAN CIVIL LIBERTIES UNION,
on behalf of its members, and AMERICAN
CIVIL LIBERTIES UNION of MICHIGAN,
on behalf of its members,

                                           Hon. Gershwin A. Drain

                  Plaintiffs,

vs.                                        Case No. 15-cv-12611

TRINITY HEALTH CORPORATION, an
Indiana corporation, and TRINITY
HEALTH – MICHIGAN, a Michigan
corporation,

                  Defendants.

_____/


## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
## OR IN THE ALTERNATIVE STAY CASE

## **TABLE OF CONTENTS**

**STATEMENT OF THE ISSUES PRESENTED** .................................................iii

**CONTROLLING OR APPROPRIATE AUTHORITIES**...................................v

**FACTS**..................................................................................................................1

**STATUTORY BACKGROUND** ...........................................................................3

**ARGUMENT** .........................................................................................................5

  **I.   PLAINTIFFS HAVE STANDING.**...............................................................5

    A.   Article III Standing ...............................................................................6

    B.   Prudential Standing ............................................................................12

  **II.  PLAINTIFFS PROPERLY STATE A CLAIM UNDER EMTALA.** ........13

  **III. PLAINTIFFS PROPERLY STATE A CLAIM UNDER THE
    REHABILITATION ACT.** ......................................................................20

  **IV. NEITHER FEDERAL NOR STATE REFUSAL STATUTES ARE
    APPLICABLE HERE.** ............................................................................21

  **V.  THE FIRST AMENDMENT DOES NOT BAR PLAINTIFFS'
    CLAIMS.**.................................................................................................23

  **VI. THIS COURT SHOULD NOT STAY RESOLUTION OF THIS CASE.**..28

**CONCLUSION**.....................................................................................................30

## STATEMENT OF THE ISSUES PRESENTED

1.   Whether Plaintiffs have plausibly alleged Article III standing to sue for declaratory and injunctive relief against Defendants' policy of prohibiting abortions, even in emergencies, on behalf of their thousands of members, including:

   (a) at least one woman who was pregnant at the time the case was filed, had a history of disabling pregnancy complications that required the directly intended termination of her pregnancy, was harmed during a previous pregnancy by Defendants' refusal to provide stabilizing treatment due to the challenged policy, and lives in a county where the only hospital is operated by Defendants;

   (b) other women who are currently pregnant, have been pregnant in the past, or will be pregnant in the future, some of whom will experience pregnancy complications, and who rely on Defendants' hospitals for emergency care.

2.   Whether Plaintiffs, whose members include the women described above, have plausibly stated a claim for declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, against the corporate entities that own, operate and set patient care policy for hospitals that operate emergency rooms and receive Medicare funds; and that prohibit physicians at those hospitals from performing abortions, even when necessary to stabilize a woman experiencing an emergency medical condition.

iii

3.  Whether Plaintiffs, whose members include the women described above, identified a disabled individual as required to state a claim under the Rehabilitation Act (RA), 29 U.S.C. § 794.

4. Whether 42 U.S.C. § 300a-7, or a state law, M.C.L.A. § 333.20181, excuses Defendants from complying with EMTALA and the RA.

5.  Whether the First Amendment bars a suit against corporations that run and set policies for hospitals for failure to provide appropriate emergency care to patients in violation of EMTALA and violations of the RA.

## **CONTROLLING OR APPROPRIATE AUTHORITIES**

**Cases**

*Alexander v. Choate*, 469 U.S. 287 (1985) ..................................................4

*Cerrato v. Durham*, 941 F. Supp. 388 (S.D.N.Y. 1996).........................20

*Chrisman v. Sisters of Saint Joseph of Peace*, 506 F.2d 308 (9th Cir. 1974) .........22

*Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir. 1990)......3, 14

*Equal Employment Opportunity Commission v. J.H. Routh Packing Company*, 246 F.3d 850 (6th Cir. 2001) .......................................................................20

*Estate of Haight v. Robertson*, No. 03-CV-885, 2008 WL 906013 (N.D. Ind. Mar. 31, 2008) .............................................................................................16

*Federal Election Commission v. Akins*, 524 U.S. 11 (1998) ..................................13

*Fialka-Feldman v. Oakland University Board of Trustees*, 678 F. Supp. 2d 576 (E.D. Mich. 2009) ...........................................................................................4

*Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) 9

*Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576 (6th Cir. 2014)......... 10, 21

*General Conference Corporation of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010)..............................................................................................25

*Grant v. Trinity Health-Michigan*, 390 F. Supp. 2d 643 (E.D. Mich. 2005) ..........16

*Haywood v. Drown*, 556 U.S. 729 (2009) .............................................................23

*Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Supp. 2d 913 (N.D. Ill. 2013) ........20

*In re Myers*, No. 11-61426, 2012 WL 2884890 (N.D. Ohio July 13, 2012)...........29

*Jones v. Wolf*, 443 U.S. 595 (1979) .......................................................................25

v

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952) ..............................................................24

*Kentucky v. United States ex rel. Hagel*, 759 F.3d 588 (6th Cir. 2014) .................13

*Landis v. North American Company*, 299 U.S. 248 (1936)............................. 28, 29

*Larson v. Valente*, 456 U.S. 228 (1982) ...................................................12

*Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) .....................................................................................13

*Lubinski v. Hub Group Trucking, Inc.*, No. 14-CV-02843, 2015 WL 4603878 (W.D. Tenn. July 30, 2015) .................................................................29

*Martinelli v. Bridgeport Roman Catholic Diocesan Corporation*, 196 F.3d 409 (2d Cir. 1999) ...................................................................................26

*Massachusetts v. Environmental Protection Agency,* 549 U.S. 497 (2007)............13

*Mayorga v. Alorica, Inc.*, No. 12-CV-21578, 2012 WL 3043021 (S.D. Fla. July 25, 2012) .........................................................................................20

*Maziarka v. Saint Elizabeth Hospital*, No. 88-CV-6658, 1989 WL 13195 (N.D. Ill. Feb. 16, 1989) .................................................................................8

*Means v. United States Conference of Catholic Bishops*, No. 15-CV-353, 2015 WL 3970046 (W.D. Mich. June 30, 2015) ......................................................... 27, 28

*Morin v. Eastern Maine Medical Center*, 779 F. Supp. 2d 166 (D. Me. 2011) ........7

*Moses v. Providence Hospital & Medical Centers, Inc.*, 561 F.3d 573 (6th Cir. 2009) ...................................................................................... 14, 16

*MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002).........................4

*National Rifle Association of America v. Magaw*, 132 F.3d 272 (6th Cir. 1997) ...19

*Ogle v. Hocker*, 279 F. App'x 391 (6th Cir. 2008)..................................................25

*Ohio Environmental Council v. United States District Court*, 565 F.2d 393 (6th Cir. 1977) .................................................................................................29

*Owens v. Nacogdoches County Hospital District*, 741 F. Supp. 1269 (E.D. Tex. 1990) .........................................................................................................8

*Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133 (9th Cir. 2002) ........... 10, 21

*Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969) ...........................................................................................24

*Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004) 6, 8, 10

*Serbian Eastern Orthodox Diocese for the United States & Canada v. Milivojevich*, 426 U.S. 696 (1976) ...........................................................................................24

*Spees v. James Marine, Inc.*, 617 F.3d 380 (6th Cir. 2010) ...............................4, 20

*United States Association Foundation v. Land*, No. 08-CV-14019, 2010 WL 1131493 (E.D. Mich. Mar. 23, 2010) ...........................................................8, 10

*Watson v. Jones*, 80 U.S. 679 (1871) ....................................................................24

**Statutes**

29 U.S.C. § 705(20)(B) ..........................................................................................4

29 U.S.C. § 794(a) ..............................................................................................4, 22

29 U.S.C. § 794a(a)(2) ............................................................................................5

42 U.S.C. § 1395dd .................................................................................................3

42 U.S.C. § 1395dd(c)(1) ......................................................................................17

42 U.S.C. § 1395dd(d)(2)(a) ...................................................................................4

42 U.S.C. § 1395dd(e)(1)(A) ..................................................................................3

42 U.S.C. § 1395dd(e)(1)(B) ..................................................................................3

42 U.S.C. § 1395dd(e)(2).........................................................................22

42 U.S.C. § 1395dd(e)(3)(A) ...................................................................4

## FACTS

Plaintiffs are membership organizations with members in every state where a Defendant hospital with an emergency department is located. Am. Compl. ¶¶ 7, 9. Plaintiffs' members include women in those states who are currently pregnant, have been pregnant in the past, and will become pregnant in the future. *Id*. ¶¶ 8, 10, 38, 41-42. Unfortunately, there are a number of conditions that arise during, or that are exacerbated by, pregnancy "where the absence of immediate medical attention could reasonably be expected to result in placing the individual . . . in serious jeopardy, [or cause] serious impairment to bodily functions, or serious dysfunction of any bodily organ or part." *Id.* ¶ 24. Certain pregnancy complications also cause physical impairments that substantially limit major life activities. *Id.* ¶ 52. In such cases, the standard of care may require prompt evacuation of the uterus prior to viability, thereby terminating the pregnancy. *Id.* ¶ 26; *see also id.* ¶¶ 54, 56.

Defendant Trinity Health is the parent corporation of a Catholic health care system, which includes hospitals in multiple states. *See* Defs.' Br. 3. Defendant Trinity Health-Michigan is a subsidiary of Trinity Health "that owns and operates Catholic hospitals . . . in the state of Michigan." *Id*. Defendants concede that all Trinity hospitals adhere to a policy known as the Ethical and Religious Directives for Catholic Health Care Services ("Directives"), *see id.* at 4, which prohibits physicians from terminating the previability pregnancy of a woman suffering from

pregnancy complications—even when such care is urgently needed to protect a woman's health or life and even when the death of the fetus is inevitable, *see* Am. Compl. ¶¶ 25-36. As a result of Defendants' policy, multiple women—including at least one of Plaintiffs' members—have suffered severe harm, including sepsis, hemorrhage, and life-threatening infections. *Id.* ¶¶ 37-40, 63-64.

Moreover, as a result of the Directives, pregnant women who must rely on Defendants' hospitals—including at least one of Plaintiffs' members—face a direct, present, and credible threat that they will be denied the care they need. For example, Plaintiffs' members include a woman with a history of pregnancy complications requiring the directly intended termination of a previability pregnancy, who had been harmed by the Directives in the past, who lives in a county where the only hospital is owned and operated by Defendants, and was pregnant at the time this case was filed. *Id.* ¶¶ 38, 41-43, 66. This member reasonably feared that, due to the Directives, she would be unable to obtain appropriate treatment should something again go wrong with her pregnancy. *Id.* ¶¶ 43, 66. Moreover, as Plaintiffs' members include women who are currently pregnant, and who will become pregnant in the future, and who rely on Defendants' hospitals, the threat to Plaintiffs' members posed by the Directives is ongoing. *Id.* ¶¶ 8, 10, 41-42, 67.

2

## STATUTORY BACKGROUND

The Emergency Medical Treatment and Active Labor Act (EMTALA) imposes a screening and stabilization requirement on hospitals that participate in the Medicare program and operate an emergency department. 42 U.S.C. § 1395dd. If a covered hospital determines that an individual has an emergency medical condition, it must "stabilize the medical condition before transferring (or discharging) a patient." *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268 (6th Cir. 1990) (citing 42 U.S.C. § 1395dd(b)(1), (c)(1)). EMTALA defines an emergency medical condition as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A). With respect to a woman having contractions, emergency medical condition means "(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child." *Id.* § 1395dd(e)(1)(B). To stabilize a patient with such a condition, the hospital must "assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer [or discharge] of the

3

individual from a facility." *Id.* § 1395dd(e)(3)(A). EMTALA specifically allows for equitable relief, as appropriate. *Id.* § 1395dd(d)(2)(a). Defendants are subject to the requirements of EMTALA. Am. Compl. ¶ 23.

The Rehabilitation Act (RA) prohibits federally funded programs or activities from excluding, denying benefits to, or discriminating against, an "otherwise qualified individual with a disability . . . solely by reason of her or his disability[.]" 29 U.S.C. § 794(a). A disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual[.]" *See id.* § 705(20)(B) (citing 42 U.S.C. § 12102(1)(A)). This includes certain pregnancy complications. *Spees v. James Marine, Inc.*, 617 F.3d 380, 396-97 (6th Cir. 2010).[1] The RA also requires federally funded programs or activities to provide disabled persons with "reasonable accommodations" to ensure that they have "meaningful access" to that program or activity. *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *see also Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 678 F. Supp. 2d 576, 584 (E.D. Mich. 2009) (same). The failure to provide a disabled individual with a reasonable accommodation constitutes discrimination under the RA. *Alexander*, 469 U.S. at 301. Remedies available under the RA

---

[1] Courts use analysis from cases involving the Americans with Disabilities Act (ADA) to analyze Rehabilitation Act claims and vice versa. *See MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332 (6th Cir. 2002).

4

include declaratory and injunctive relief. 29 U.S.C. § 794a(a)(2) (citing 42 U.S.C.

§ 2000d *et seq*). Defendants are subject to the RA. Am. Compl. ¶ 51.

## ARGUMENT

Courts considering a motion to dismiss must "construe the complaint in the

light most favorable to the plaintiff and accept all factual allegations as true."

*Laborers' Loc. 265 Pension Fund v. iShares Trust*, 769 F.3d 399, 403 (6th Cir.

2014). Thus, a plaintiff need only "plead sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face." *Grubbs v. Sheakley Grp., Inc.*,

807 F.3d 785, 792 (6th Cir. 2015) (internal citations omitted). "At the pleading

stage, general factual allegations of injury resulting from the defendant's conduct

may suffice, for on a motion to dismiss we presume that general allegations

embrace those specific facts that are necessary to support the claim." *Parsons v.*

*U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (internal citations

omitted).

## I.      PLAINTIFFS HAVE STANDING.

Plaintiffs have alleged that Defendants have a formal policy that prohibits

doctors at Defendants' more than 80 hospitals from complying with EMTALA and

the RA for women in need of emergency abortion care. Not once in their brief do

Defendants assert that physicians at Trinity hospitals are permitted to perform

abortions whenever a pregnant woman presents at a Trinity emergency department

and is experiencing an emergency medical condition (as defined by EMTALA), or disabling pregnancy complications (as defined by the RA), that necessitates a previability abortion.[2] Instead, Defendants argue that Plaintiffs lack standing and that this Court must permit Defendants to continue to enforce their policy until another woman's health or life is put in jeopardy. Defendants' argument is akin to arguing that even if a hospital emergency room hung a sign stating "No Indigent or Disabled Patients Treated Here," uninsured and disabled patients living in the area would lack standing to bring suit. That argument belies common sense and, in any event, is simply not the law. *See Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004), *infra* at 10.

A.    Article III Standing

To invoke federal subject matter jurisdiction, "a plaintiff must establish three elements: (1) an injury in fact that is concrete and particularized; (2) a connection between the injury and the conduct at issue—the injury must be fairly traceable to the defendant's action; and (3) [a] likelihood that the injury would be redressed by

---

[2] Defendants repeatedly allude to Directive 47, *see* Defs.' Br. 4 n.2, 11-12, 21-22, to suggest that in some undefined circumstances a doctor at the hospital might be allowed to provide an abortion. But strikingly, Defendants never state that it or any other policy permits a physician to perform an abortion in every circumstance in which it is the medically appropriate treatment for a woman experiencing an emergency medical condition or disabling pregnancy complication. Indeed, as will become clear in the course of this case, Directive 47 addresses only a discrete set of conditions in which a pregnancy is indirectly terminated in the course of providing other care.

6

a favorable decision of the Court." *Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir. 2002) (internal quotations omitted) (alteration in original). Defendants concede that Plaintiffs establish associational standing if at least one of their members has Article III standing. Defs.' Br. 7-8.[3]

Contrary to what Defendants assert in their brief, *id.* at 9, Plaintiffs have alleged numerous past incidents where women (including at least one of Plaintiffs' members) were denied appropriate treatment under EMTALA and the RA at Defendants' hospitals as a result of the Directives, suffering severe injury as a result. *See supra* 1-2. Likewise, Plaintiffs' allegations describe at least one member who was pregnant at the time the case was filed, had a history of severe pregnancy complications requiring the directly intended termination of a previability pregnancy, had been denied such care by Defendants (due to the challenged policy) in the past, lives in a county where the only hospital was a Trinity Hospital, and feared she would be unable to get the care she needed if she once again experienced complications. Am. Compl. ¶¶ 4-43. Plaintiffs have therefore more than plausibly alleged that Defendants' policy directly threatens at least one, if not more, of Plaintiffs' members with substantial injury.[4] *Cf. U.S. Student Ass'n*

---

[3] Defendants do not argue that Plaintiffs fail to satisfy the other elements of associational standing. Defs.' Br. 7-8.

[4] That this member will not remain pregnant throughout the pendency of this litigation does not diminish the strength of this showing. *See, e.g.*, *Morin v. E. Me. Med. Ctr.*, 779 F. Supp. 2d 166, 180 (D. Me. 2011) ("In the EMTALA context . . .

7

*Found. v. Land*, No. 08-CV-14019, 2010 WL 1131493, at *8 (E.D. Mich. Mar. 23, 2010) (finding standing at motion to dismiss stage where, "with approximately 20,000 members . . . it was likely that Plaintiffs would later be able to produce one or more members . . . at risk" of future erroneous denial of voter registration) (attached hereto as Exhibit A).

As the Sixth Circuit has explained, that Plaintiffs cannot identify in advance any members who are *certain* to be denied the care to which they are legally entitled, does not transform this Article III injury into non-cognizable speculation. In *Sandusky*, the Sixth Circuit held that the threat that at least one of the plaintiffs' members' ability to cast a provisional ballot would be affected by the challenged policy was sufficient to confer Article III standing to seek prospective relief, even though the plaintiffs could not identify in advance any particular member whose rights would definitely be violated. 387 F.3d at 573-74. As the court explained:

---

courts have generally rejected the defense argument that the statute does not authorize injunctive relief for a person who seeks treatment sporadically, including specifically for women who are no longer pregnant by the time the court is able to act."); *Owens v. Nacogdoches Cty. Hosp. Dist.*, 741 F. Supp. 1269, 1280 (E.D. Tex. 1990) ("Given that the wrongs sought to be addressed by the Antidumping Act are precisely not continuing but episodic, since that is the nature of emergency medical conditions and of childbirth, it simply does not make sense to assert that [plaintiff] ceased to have standing for equitable relief when she gave birth. To so hold would render the inclusion of equitable relief in the statute mere surplusage."); *see also Maziarka v. St. Elizabeth Hosp.*, No. 88-CV-6658, 1989 WL 13195, at *1 (N.D. Ill. Feb. 16, 1989) (rejecting argument that injunction is only proper if party can show "that he would be subject to *future* transfers from the emergency room . . . in an unstable condition because he has no medical insurance") (emphasis added) (attached hereto as Exhibit B).

8

> [Plaintiffs] have not identified specific voters who will seek to
> vote at a polling place that will be deemed wrong by election
> workers, but this is understandable; by their nature, mistakes
> cannot be specifically identified in advance. . . . It is inevitable,
> however, that there will be such mistakes. The issues
> [plaintiffs] raise are not speculative or remote; they are real and
> imminent.

*Id.* at 574; *see also Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163

(11th Cir. 2008) ("To satisfy . . . associational standing, all that plaintiffs need to

establish is that at least one member faces a realistic danger of having his or her

application rejected due to a mistaken mismatch. Given that [plaintiffs] collectively

claim around 20,000 members . . . it is highly unlikely—even with only a one

percent chance of rejection for any given individual—that not a single member will

have his or her application rejected due to a mismatch.").

The same principle applies here: unless and until the worst has happened, no

woman can know in advance that her health will deteriorate to the point that she

will need to terminate a wanted pregnancy in order to preserve her life or health.

Given the concreteness of the threat posed to Plaintiffs' pregnant member, coupled

with the fact that all of Defendants' hospitals adhere to the Directives; that

Plaintiffs' many thousands of members include women of childbearing age in all

of the states where Defendants operate hospitals; and the biological inevitability

that women will continue to become pregnant and that some of those women will

experience complications that require the direct termination of their pregnancy

9

prior to viability, Plaintiffs' allegations are sufficient to show Article III injury. *See Sandusky Cty. Democratic Party*, 387 F.3d at 574; *see also U.S. Student Ass'n Found.*, 2010 WL 1131493 at *8.[5]

Plaintiffs readily satisfy the causation prong of standing as well. Defendants attempt to avoid responsibility for the harm caused by the Directives by claiming that "[t]he decision to provide a 'stabilizing' procedure is made by the treating physicians, and *not* the health system." Defs.' Br. 11 (emphasis in original). However, with respect to abortion, Plaintiffs have alleged that Defendants' policies by their own terms prohibit physicians at their hospitals from performing the directly intended termination of a previability pregnancy even in emergency circumstances.[6] *See* Am. Compl. ¶ 12.

---

[5] Similarly, the Sixth Circuit recently stated that "a plaintiff demonstrates the requisite threat of future injury [for disability discrimination claims] where he establishes (1) a plausible intent to return to the noncompliant accommodation or (2) that he would return, but is deterred from visiting the noncompliant accommodation because of the alleged accessibility barriers." *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 580 (6th Cir. 2014) (attached hereto as Exhibit C). Plaintiffs have made comparable allegations here. Am. Compl. ¶¶ 41, 43, 64. If anything, Plaintiffs' case is made stronger by the unplanned, spontaneous nature of emergency hospital visits and the lack of emergency care alternatives. *See also Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1135 (9th Cir. 2002) ("[W]hen a plaintiff who is disabled within the meaning of the ADA has actual knowledge of illegal barriers at a public accommodation to which he or she desires access, that plaintiff need not engage in the 'futile gesture' of attempting to gain access in order to show actual injury during the limitations period.").

[6] *See supra* at 4, n.1.

10

The Supreme Court's decision in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), is inapposite. *See* Defs.' Br. 9-11. In *Simon*, the plaintiff argued that the IRS, by failing to withhold favorable tax treatment from hospitals that were supposed to, but did not, provide comprehensive treatment to indigent patients, incentivized those hospitals to deny the care. 426 U.S. at 42. The sole defendant in the case was the IRS, *id.* at 41, which, while responsible for enforcing federal tax laws, had no responsibility for setting patient care policies at any hospital. The Supreme Court held that the alleged link between the IRS's failure to enforce a particular tax law and the failure of hospitals not before the court to provide comprehensive treatment to indigent patients was too attenuated to satisfy causation under Article III. *Id.* at 42-46.

However, unlike *Simon*, this case is not about whether tax law influences the delivery of patient care; it is about whether a hospital policy that prohibits patient care influences the delivery of patient care. Moreover, unlike in *Simon*, the defendants in this case are the very corporate entities that set the hospital policy at issue. *See* Am. Compl. ¶ 2. Thus, unlike in *Simon*, there is simply nothing speculative about "whether the denials of service specified in the complaint fairly can be traced to [Defendants' policies][.]" Defs.' Br. 10 (quoting *Simon*, 426 U.S. at 42-43).

11

Lastly, the relief Plaintiffs seek would lift the significant threat posed by the Directives to every pregnant woman seeking emergency care barred by the Directives at a Trinity hospital, thereby satisfying the redressability requirement. Defendants attempt to frame this case as one seeking redress for *past* injuries, rather than a case seeking to block the *ongoing threat* the Directives pose to Plaintiffs' members. *Id.* at 11-12. But viewed properly, there is no question that by preventing Defendants from withholding federally mandated emergency medical care, Plaintiffs' members "personally would benefit in a tangible way from the court's intervention." *Id.* at 11 (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)).[7]

B.    Prudential Standing

Defendants' argument that this Court should decline to hear Plaintiffs' case solely as a prudential matter is without merit. Defs.' Br. 12-14. In *Lexmark International, Inc. v. Static Control Components, Inc.*, the defendant argued, as here, that even though the plaintiff had satisfied Article III standing to raise a statutory claim, the Supreme Court "should decline to adjudicate [the plaintiff's statutory] claim on grounds that are 'prudential,' rather than constitutional." 134 S.

---

[7] It is thus entirely irrelevant that, in the absence of the Directives, a physician might independently commit an EMTALA or RA violation. Defs.' Br. 12. Plaintiffs need not prove that a favorable decision would relieve every conceivable injury. *See Larson v. Valente*, 456 U.S. 228, 242-43 (1982). To require otherwise would result in a "draconic interpretation of the redressability requirement that is justified by neither precedent nor principle." *Id.* at 243 n.15.

12

Ct. 1377, 1386 (2014). The Court refused, explaining that "[j]ust as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Id.* at 1388 (internal citations omitted); *see also Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 596 n.3 (6th Cir. 2014) ("In several recent cases, the Supreme Court has reaffirmed that 'a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.'") (quoting *Susan B. Anthony List v. Driehaus,* —— U.S. ——, 134 S. Ct. 2334, 2347 (2014)) (internal quotation marks omitted). Where, as here, the requirements for Article III standing are met, this Court does not have the authority to refuse to hear Plaintiffs' case.[8]

## II.   PLAINTIFFS PROPERLY STATE A CLAIM UNDER EMTALA.

Plaintiffs' allegations are more than sufficient to state a claim that Defendants' policies violate EMTALA by prohibiting the directly intended

---

[8] In any event, Plaintiffs do not merely assert a "generalized grievance." Defs.' Br. 13. As Plaintiffs have already demonstrated, at least one of their members faces a realistic threat of *personal* harm. *See supra* at 1-2, 7-8. ¶ 43. Contrary to Defendants' assertions, the fact that the Directives put the life and health of a large number of women in danger does not counsel *against* this court's decision to hear this case, but weighs heavily in its favor. *Cf. Massachusetts v. Envtl. Protection Agency,* 549 U.S. 497, 522 (2007) (finding state had Article III standing to challenge EPA's failure to regulate gas emissions based on widely-shared risks posed by climate change); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) (holding that fact that concrete harm is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts).

13

termination of a pregnancy before viability even where a woman is experiencing an emergency medical condition and an abortion is necessary to stabilize her condition. As a legal matter, the Sixth Circuit takes a broad view of a hospital's obligations under EMTALA. For example, the Sixth Circuit has flatly rejected the argument that EMTALA applies only to claims of patient dumping of indigent patients. *See Cleland*, 917 F.2d at 269-70. As the Court has explained:

> We can think of many reasons other than indigency that might lead a hospital to give less than standard attention to a person who arrives at the emergency room. These might include: prejudice against the race, sex, or ethnic group of the patient; distaste for the patient's condition (e.g., AIDS patients); . . . or political or cultural opposition. If a hospital refused treatment to persons for any of these reasons, or gave cursory treatment, the evil inflicted would be quite akin to that discussed by Congress in the legislative history, and the patient would fall squarely within the statutory language.

*Id.* at 272. The Sixth Circuit has similarly refused to limit a cause of action under EMTALA to *patients* treated at the hospital where the alleged EMTALA violation took place, holding that the plain language of the statute contains no such restrictions. *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 580 (6th Cir. 2009); *see also id.* at 579-82.[9]

---

[9] The Sixth Circuit has also held that "EMTALA imposes an obligation on a hospital beyond simply admitting a patient with an emergency medical condition to an inpatient care unit." *Moses*, 561 F.3d at 582. "[T]he statute requires more than the admission and further testing of a patient; it requires that actual care, or treatment, be provided as well." *Id.*

14

Defendants' arguments that Plaintiffs have failed to state an EMTALA claim are unavailing. First, despite substantial case law permitting corporate entities to be sued under EMTALA, Defendants contend they cannot be named as defendants in this suit because "Trinity is not even a 'hospital.'" Defs.' Br. 15. Yet by Defendants' own terms, Trinity Health is the parent corporation of a health care system that includes hospitals and other entities that provide health care services, *see id.* at 3, and Trinity Health-Michigan is a subsidiary of Trinity Health "that owns and operates Catholic hospitals . . . in the state of Michigan," *id.* According to the articles of incorporation Defendants attach to their brief, Trinity Health's corporate purpose includes "establishing, maintaining, owning, managing, operating, transferring, conveying, supporting, assisting and acquiring institutions, facilities and programs in several states, directly or through one or more affiliates, including, but not limited to, hospitals[.]" Defs.' Br., Ex. D at 9. The articles of incorporation also state that the activities of Trinity Health "shall be carried out in a manner consistent with . . . the *Ethical and Religious Directives for Catholic Health Care Services*[.]" *Id.* at 10. In other words, Defendants are corporate entities that own and operate hospitals and are required, by the terms of their own corporate structure, to adhere to the Directives in doing so. Defendants cite no authority suggesting that a corporate entity that owns and operates hospitals that participate in the Medicare program, and requires those hospitals to adhere to a

15

policy that is alleged to violate EMTALA, cannot be sued under EMTALA. To the contrary, corporate entities—including Defendants themselves—are routinely named as defendants in EMTALA cases under a variety of circumstances. *See, e.g.*, *Romine v. St. Joseph Health Sys.*, 541 F. App'x 614 (6th Cir. 2013) (attached hereto as Exhibit D); *Moses*, 561 F.3d 573; *Grant v. Trinity Health-Michigan*, 390 F. Supp. 2d 643 (E.D. Mich. 2005); *Broughton v. St. John Health Sys.*, 246 F. Supp. 2d 764 (E.D. Mich. 2003); *Robinson v. Henry Ford Health Sys.*, 892 F. Supp. 176 (E.D. Mich. 1994); *see also Estate of Haight v. Robertson*, No. 03-CV-885, 2008 WL 906013 (N.D. Ind. Mar. 31, 2008) (naming Trinity Health as defendant) (attached hereto as Exhibit E).

Indeed, the sole case cited by Defendants in support of their argument, *Medero Diaz v. Grupo de Empresas de Salud*, 112 F. Supp. 2d 222 (D.P.R. 2000), does not even address this specific question. In *Medero Diaz*, the court dismissed an EMTALA claim against a private corporation that contracted to provide medical professional services at a municipal hospital, holding that the corporation was not a "participating hospital" for purposes of EMTALA. *Id*. at 225-26. Noting that EMTALA provides a private right of action against participating hospitals, but not against individual physicians, the district court reasonably concluded that a corporate entity that independently contracted to provide medical staff only to a

16

hospital—and, unlike Defendants, had absolutely no power to dictate hospital policy—could not be sued under EMTALA. *Id.*

Second, Defendants misconstrue the plain language of the statute by suggesting that any individual asserting an EMTALA violation must show that the hospital could have transferred the patient elsewhere, but declined to do so. Defs.' Br. 16. EMTALA flatly prohibits the transfer or discharge of any individual with an emergency medical condition who has not been stabilized *unless* (a) either the patient requests a transfer, despite having been informed of the hospital's obligations and the risk of transfer, or a physician certifies that the medical benefits of treatment at another facility outweigh the increased risks to the individual from the transfer; *and* (b) the transfer meets the statutory definition of an "appropriate transfer." 42 U.S.C. § 1395dd(c)(1). The plain language of EMTALA does not permit hospitals to simply refuse to stabilize individuals and offer them a transfer instead.

Finally, in arguing that Plaintiffs' EMTALA claim should be dismissed because their members have not suffered "personal harm," Defs.' Br. 15, Defendants simply rehash their standing arguments (to no avail). As noted above, Plaintiffs have alleged that multiple women, including at least one of Plaintiffs' members, have already been harmed by Defendants, and that the Directives pose an ongoing, real risk of personal harm to their members who are currently pregnant

17

or will become pregnant in the future and who rely on Defendants' hospitals for emergency care. *See supra* 1-2, 7-8. Indeed, Plaintiffs have specifically alleged that at least one of their members who was pregnant at the time the case was filed, had a history of severe pregnancy complications requiring the directly intended termination of a previability pregnancy, had been denied such care by Defendants (due to the challenged policy) in the past, lives in a county where the only hospital is a Trinity Hospital, and experienced serious anguish and distress because she feared she would be unable to get the care she needed if she once again experienced complications. *See supra* 1-2, 7-8; *see also Abney v. Univ. Med. Ctr. of S. Nev.*, No. 09-CV-02418, 2011 WL 468349, at *4 (D. Nev. Feb. 4, 2011) (recognizing emotional harm as cognizable under EMTALA) (attached hereto as Exhibit F). Defendants' suggestion that Plaintiffs are seeking injunctive relief on behalf of "third parties," Defs.' Br. 16, is similarly unavailing. In an associational or organizational standing case, a plaintiff-organization's members are not considered "third parties" to the action; the organization represents their interests as if they were before the court themselves.[10] *See* 13A Wright & Miller, Fed. Prac.

---

[10] For much the same reason, Defendants' claim that injunctive relief in this case would result in inappropriate judicial oversight over Trinity hospitals is misplaced. Defs.' Br. 16-17. EMTALA's private right of action clearly authorizes this Court to provide plaintiffs with injunctive relief. Congress imposed no limitations on this power, nor made any exceptions to this general rule for widespread, systemic, or repeated violations of federal law such as those at issue in this case. *Cf. Cleland*, 917 F.2d at 269 (rejecting defendants' argument that private right of action under

18

& Proc. Juris. § 3531.9.5 (3d ed.). Defendants also completely ignore that Plaintiffs have also requested declaratory relief. Am. Compl. ¶ 18. Therefore, even assuming *arguendo* that injunctive relief is not proper here, Plaintiffs have nonetheless stated a claim for relief under EMTALA.[11] *See Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997) (holding Declaratory Judgment Act requires court to ask "whether the parties have 'adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' *even though the injury-in-fact has not yet been completed*") (emphasis added).

---

EMTALA is limited to indigent patients because "[u]nfortunately for this theory, Congress wrote a statute that plainly has no such limitation on its coverage").

[11] In the Sixth Circuit, courts apply a five-factor test to determine whether to consider a request for declaratory relief: "(1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata;' (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective." *Acuity, A Mut. Ins. Co. v. Reliable Inv., LLC*, No. 15-CV-10751, 2015 WL 6108299, at *1 (E.D. Mich. Oct. 16, 2015) (quoting *Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)) (attached hereto as Exhibit G). There is no question that declaratory relief from this court would settle the question of whether the Directives violate EMTALA and clarify Defendants' legal obligations under EMTALA. Likewise, there is no suggestion that this case is being used in a "race for res judicata," or that a federal court interpreting a federal law, would in any way improperly encroach on state jurisdiction. Finally, the only alternative remedy to declaratory (and injunctive) relief is to wait until another woman is harmed to consider these questions. There is no sense in which that is better or more effective than resolving the issue now.

19

### III.   PLAINTIFFS PROPERLY STATE A CLAIM UNDER THE REHABILITATION ACT.

Plaintiffs have likewise properly stated a claim for declaratory and injunctive relief under the RA. Defendants' sole argument to the contrary is that Plaintiffs have failed to identify a person who is "disabled." As discussed below, that is inaccurate.

Pregnancy-related complications and conditions can constitute disabilities, *Spees*, 617 F.3d at 396-97, and Defendants concede as much, Defs.' Br. 18. The Sixth Circuit has also recognized the risk of miscarriage, based on a history of pregnancy complications, can be a disability. *Spees*, 617 F.3d at 397. As explained above, Plaintiffs have alleged that one of its members (who was pregnant at the time the case was filed) has suffered from disabling pregnancy complications in the past, lives in a county where the only hospital is operated by Defendants, and therefore  "fears that she will be unable to obtain emergency medical services" should complications arise again. Am. Compl. ¶ 66.[12] Therefore, Plaintiffs have

---

[12] Whether the particular condition rises to the level of disability is a question of fact not appropriate for resolution on a motion to dismiss. *See, e.g.*, *Mayorga v. Alorica, Inc.*, No. 12-CV-21578, 2012 WL 3043021, at *6 (S.D. Fla. July 25, 2012) (attached hereto as Exhibit H); *Cerrato v. Durham*, 941 F. Supp. 388, 393 (S.D.N.Y. 1996); *see also Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Supp. 2d 913, 920-21 (N.D. Ill. 2013) (finding triable issue of fact regarding whether high-risk pregnancy rendered the Plaintiff disabled under the ADA). "[S]o long as the complaint notifies the defendant of the claimed impairment, the substantially limited major life activity need not be specifically identified in the pleading." *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 854 (6th Cir. 2001).

properly identified at least one disabled member for purposes of asserting a claim under the RA. *See generally Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579-80 (6th Cir. 2014) (attached hereto as Exhibit C); *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1135 (9th Cir. 2002).[13]

## IV.   NEITHER FEDERAL NOR STATE REFUSAL STATUTES ARE APPLICABLE HERE.

Defendants argue that 42 U.S.C. § 300a-7 "prohibits any requirement" that health care entities provide abortion under any circumstance. Defs.' Br. 18-19. Yet a review of the actual text reveals that it says nothing of the kind:

> The receipt of any grant, contract, loan, or loan guarantee under the Public Health Service Act [42 U.S.C. § 201 *et seq*.], the Community Mental Health Centers Act [42 U.S.C. § 2689 *et seq*.], or the Developmental Disabilities Services and Facilities Construction Act [42 U.S.C. § 6000 *et seq*.] by any individual or entity does not authorize any court or any public official or other public authority to require— . . .
>
> (2) such entity to—
>
> (A) make its facilities available for the performance of any sterilization procedure or abortion if the performance of such procedure or abortion in such facilities is prohibited by the entity on the basis of religious beliefs or moral convictions[.]

42 U.S.C. § 300a-7(b). Thus, this law would prohibit a court from ruling that an entity was obligated to provide abortions *because* it received one of the three

---

[13] Defendants do not dispute that Plaintiffs have adequately alleged the remaining elements of their RA claim.

funding streams listed in the statute.[14] But Plaintiffs make no such argument.

Rather, Plaintiffs' claim is that two later statutes impose an obligation as a

condition of receipt of *different* federal funding streams to provide emergency

abortion services in certain circumstances. *See* 42 U.S.C. § 1395dd(e)(2) (defining

"participating hospitals" for the purpose of EMTALA as those that have entered

into Medicare agreements pursuant to 42 U.S.C. § 1395cc); 29 U.S.C. § 794(a)

(prohibiting discrimination in any "program or activity receiving Federal financial

assistance or under any program or activity conducted by any Executive agency or

by the United States Postal Service").[15]

 Moreover, Defendants' argument that Michigan *state* law exempts them

from compliance with two *federal* laws is barred by basic Supremacy Clause

principles. Defs.' Br. 19-20 (citing M.C.L.A. § 333.20181). It is well settled that

---

[14] Notably, Defendants do not state whether they receive funds under the Public Health Service Act, and the other two funding streams have been repealed. *See* 42 U.S.C. § 2689; 42 U.S.C. § 6000.

[15] While the plain language of § 300a-7 means it is unnecessary to consider the statute's legislative history, that history only undercuts Defendants' argument further. The provision was enacted in the wake of the Supreme Court's decision in *Roe v. Wade* after a number of courts found that hospitals were acting under the "color of state law" by virtue of accepting certain federal funds and were therefore prohibited by *Roe* from banning the provision of abortion (or sterilization) services at their facilities. *See, e.g.*, *Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308, 310 (9th Cir. 1974) (holding that law was passed "to prohibit courts from using receipt of Hill-Burton funds as the basis for compelling" a hospital to provide sterilization procedures if contrary to religious or moral convictions). Contrary to Defendants' claim, it was never intended to impose a blanket prohibition on "any requirement" to provide abortion.

22

states "lack authority to nullify a federal right or cause of action they believe is inconsistent with their local policies." *Haywood v. Drown*, 556 U.S. 729, 736 (2009) (holding that state law could not eliminate prisoners' ability to bring claims under 42 U.S.C. § 1983). Thus, neither the federal nor the state refusal statutes are a defense to this action.

## V.    THE FIRST AMENDMENT DOES NOT BAR PLAINTIFFS' CLAIMS.

Finally, Defendants incorrectly argue that because the Directives are based on Catholic teachings, adjudication of this case would require the court to delve into religious doctrine in violation of the First Amendment. As discussed below, if Defendants' argument were accepted, this Court would be powerless to enjoin or declare unlawful any Catholic hospital's policy of refusing to provide any sort of stabilizing treatment to anyone (e.g., indigent patients, African-American patients, etc.) so long as that policy was also written in the Directives. This is not the law. Where, as here, Plaintiffs have alleged that physicians at Trinity hospitals are barred by hospital policy from performing the directly intended termination of a pregnancy, even in situations where a woman's life or health is at risk, this Court undoubtedly has the authority to declare that such policy violates Defendants' obligations under EMTALA and the RA.

Defendants rely on a line of cases that bar civil courts from resolving disputes involving "theological controversy, church discipline, ecclesiastical

government, or the conformity of the members of the church to the standard of morals required of them[.]" *Watson v. Jones*, 80 U.S. 679, 733 (1871). These cases have been referred to as the "church autonomy doctrine," and the purpose of the doctrine is to prevent courts from entangling themselves with "essentially religious controversies." *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 709–10 (1976). For example, the Supreme Court has invoked the doctrine in cases where factions of a church were fighting over which one was the "true" representative of the church, based on religious tenets, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952), and in appeals from defrocked clergy seeking review of church discipline, *Milivojevich*, 426 U.S. 696.[16]

By contrast, the Supreme Court has never applied the doctrine where, as here, a case can and should be resolved on "neutral principles of law." *See Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) (holding that civil courts may use "neutral principles of law" in deciding church disputes); *see also Jones v. Wolf*, 443 U.S. 595, 603

---

[16] Moreover, the Supreme Court has applied the doctrine only in cases involving those who give their implicit consent to be bound by churches' ecclesiastical governance and religious doctrine, such as parishioners and church employees. *See, e.g.*, *Watson*, 80 U.S. at 729 (noting that "[a]ll who unite themselves" in a church "do so with an implied consent" to be bound by church doctrine). That is clearly not the case here, as Defendants provide an undeniably secular service—emergency medical services—to patients of all faiths and no faith at all.

(1979) (the neutral principles of law approach "promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice"). Consistent with this precedent, the Sixth Circuit refused to apply the church autonomy doctrine in a defamation case between two bishops, despite the fact that the defamatory comments arose in a sermon. *See Ogle v. Hocker*, 279 F. App'x 391 (6th Cir. 2008) (attached hereto as Exhibit I).[17] The *Ogle* Court reasoned that adjudication of the case would not "interfere with any matters of church doctrine or practice" because the case did not present questions of whether the plaintiff's actions complied with church law or whether the defendant's statements were supported by doctrine. *Id.* at 396. Rather, the Court held that the claim could proceed because the "disputed issues can be resolved through application of secular standards without any impingement upon church doctrine or practice." *Id.*; *see also Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 408–09 (6th Cir. 2010) (holding that church autonomy doctrine did not apply in trademark dispute over the name of a church).[18]

---

[17] If anything, court review of the content of a sermon presents a much closer call than this case. Unlike a sermon, the Directives are an external, public document, explicitly intended for a secular audience such as "physicians, health care personnel, and patients or residents" of Catholic health care institutions and they pertain to a secular service, namely the provision of health care. *See* Defs.' Br., Ex. B at 4.

[18] Similarly, the Second Circuit applied this approach when it held that the church autonomy doctrine was not implicated in a case against a Catholic Diocese for its

These principles apply with equal, if not greater, force here. Directive 45 dictates the practice of medical care by physicians at hospitals that serve the public by prohibiting physicians from terminating the pregnancy of a woman suffering from pregnancy complications—even when such care is urgently needed to protect a woman's health or life. Plaintiffs are not asking this Court to "assess [Directive 45's] truth or validity or the extent of its divine approval or authority," *Martinell v. Bridgeport Roman Cath. Diocesan Corp.*, 196 F.3d 409, 431 (2d Cir. 1999), but merely to assess whether tying doctors' hands in this manner violates EMTALA and the RA. The legal analysis required by this case is not affected by the fact that Defendants claim the Directives are based on Catholic doctrine; indeed, the analysis would be exactly the same as if Defendants had adopted their hospital policy for secular reasons.[19] This Court can plainly decide this case based on "neutral principles of law."

---

role in covering up sexual abuse by one of the Diocese's priests. *Martinelli v. Bridgeport Roman Cath. Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999). The court held that the doctrine was not triggered because the jury was not asked to resolve any "disputed religious issue," despite the fact that it needed to determine, as a matter of fact, whether religious tenets gave rise to a fiduciary relationship between the victim of the sexual abuse and the Diocese. *Id*. at 431. The plaintiff's claim could proceed because it was brought under secular law, not church law, and the plaintiff's claim "neither relied upon nor sought to enforce the duties of the Diocese according to religious beliefs, nor did it require or involve a resolution of whether the Diocese's conduct was consistent with them." *Id*.

[19] Indeed, religious motivation for an otherwise improper act cannot insulate a party from liability. For example, in *Lundman v. McKown*, 530 N.W.2d 807 (Minn.

26

Defendants attempt to avoid this conclusion by referring to Directive 47. *See* Defs.' Br. 21-22. But as noted above, *see supra* 6, n.2, Defendants do not (and cannot) assert that Directive 47 permits physicians to provide an abortion to a woman in all emergency circumstances where, in her physician's reasonable medical judgment, it is the appropriate care. And, even if they were to make such an assertion, that would not change the analysis here. The Directives function as policy that governs the provision of health care by physicians at a hospital open to the public. As such, this Court, just like the court in *Ogle*, is perfectly competent to determine whether the prohibitions they place on doctors' care of patients violate EMTALA and the RA.

Although Defendants rely heavily on the church autonomy holding in *Means v. U.S. Conf. of Catholic Bishops*, No. 15-CV-353, 2015 WL 3970046 (W.D. Mich. June 30, 2015) (attached hereto as Exhibit J), *appeal docketed*, No. 15-1779 (6th Cir. June 30, 2015), that case does not support them here. *See* Defs.' Br. 20-23. That case (improperly) dismissed a state law claim against the U.S. Conference

---

Ct. App. 1995), the Minnesota Court of Appeals allowed Christian Scientist healers to be sued in a wrongful death action after they let an eleven-year-old boy die of diabetes. The court held that the Christian Scientist healers could be sued for wrongful death, noting that they were "free to believe what they will—and to teach and preach what they believe. But, when beliefs lead to conduct, the conduct is subject to regulation. Here, regulation is necessary for the protection of children and [the healers'] conduct, though rooted in religion, is subject to state regulation." *Id*. at 818.

of Catholic Bishops, who authored the Directives. However, in so doing, the district court in *Means* explicitly recognized that "[t]his Court is competent to address whether the *medical care provided* by Mercy physicians, and vicariously provided *by Trinity Health*, constitute negligence or medical malpractice." 2015 WL 3970046 at *13 (emphasis added); *see also id.* at *14 ("[T]he Court's consideration of the legal duty of a physician to provide adequate medical care is not a matter of church doctrine."). By the same token, this Court is clearly competent to address whether the medical care dictated by Defendants violate the standard of care required by EMTALA and the RA.

Simply put, Defendants' affiliation with the Catholic Church does not place them above the law. The church autonomy doctrine was never intended to be used to immunize any entity with a religious affiliation from liability under any federal law, and Defendants' arguments to the contrary must be rejected.

## VI.   THIS COURT SHOULD NOT STAY RESOLUTION OF THIS CASE.

Defendants' claim that this case hinges on the Sixth Circuit's decision on the church autonomy doctrine in *Means*, and should therefore be stayed until that case is decided, is without merit. Defs.' Br. 24.[20] As demonstrated above, the district

---

[20] Moreover, the party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward [] if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936); *see also Ohio Envtl. Council v. U.S. Dist. Ct.*, 565 F.2d

28

court's reasoning in *Means* is— by its own terms—inapplicable here. Therefore the potential that the Sixth Circuit's decision in that case would have a dispositive effect on this one is marginal, at best. This is plainly insufficient to meet Defendants' burden. *See e.g.*, *Lubinski v. Hub Grp. Trucking, Inc.*, No. 14-CV-02843, 2015 WL 4603878, at *2 (W.D. Tenn. July 30, 2015) (denying stay where pending appellate decision "will not conclusively resolve any of the legal issues raised in the instant case") (attached hereto as Exhibit K); *In re Myers*, No. 11-61426, 2012 WL 2884890, at *2 (N.D. Ohio July 13, 2012) (denying stay because "potential delay with the possibility of no resulting benefit" was prejudicial to non-moving party) (attached hereto as Exhibit L); *see generally  Landis v. N. Am. Co.,* 299 U.S. 248, 256 (1936) (affirming district court power to issue limited stay where "decision in [another] cause then pending . . . may not settle every question of fact and law in suits by other companies, but in all likelihood it will settle many and simplify them all."). Accordingly, Defendants' request for a stay should be denied.

---

393, 396 (6th Cir. 1977). Given that the questions before this Court concern Defendants' ongoing refusal to provide certain emergency medical services, there is clearly more than a "fair possibility" that delay "will work damage to someone else," *Landis*, 299 U.S. at 255, and Defendants cannot meet their burden.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss or in the Alternative to Stay the instant case should be denied.

Dated: January 20, 2016

<u>/s/ Brooke A. Merriweather-Tucker</u>
Brooke A. Merriweather-Tucker (P79136)
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P48085)
Kary L. Moss (P49759)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6823
<u>btucker@aclumich.org</u>
<u>dkorobkin@aclumich.org</u>
<u>msteinberg@aclumich.org</u>

Jennifer B. Salvatore (P66640)
Cooperating Attorney, American Civil
  Liberties Union Fund of Michigan
Nacht, Roumel & Salvatore, PC
101 North Main Street, Suite 555
Ann Arbor, MI 48104
(734) 663-7550
<u>jsalvatore@nachtlaw.com</u>

*Attorneys for Plaintiff American Civil*
*Liberties Union of Michigan*

<u>/s/ Alexa Kolbi-Molinas</u>
Alexa Kolbi-Molinas
Brigitte Amiri
Jennifer Dalven
Alyson Zureick
American Civil Liberties Union
  Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2633
<u>akolbi-molinas@aclu.org</u>
<u>bamiri@aclu.org</u>
<u>jdalven@aclu.org</u>
<u>azureick@aclu.org</u>

*Attorneys for Plaintiff American Civil*
*Liberties Union*

30

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 20th, 2016, I electronically filed the foregoing document with the Clerk of the Court via the ECF system which will give notification of same to all parties of record.

<u>/s/ Alexa Kolbi-Molinas</u>

January 20, 2016