## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

AMERICAN CIVIL LIBERTIES UNION,
on behalf of its members, and AMERICAN
CIVIL LIBERTIES UNION of MICHIGAN,
on behalf of its members,

                                         Hon. Gershwin A. Drain

                 Plaintiffs,

vs.                                 Case No. 15-cv-12611

TRINITY HEALTH CORPORATION, an
Indiana corporation, and TRINITY HEALTH
– MICHIGAN, a Michigan corporation,

                 Defendants,

and

CATHOLIC MEDICAL ASSOCIATION,  on
behalf of its members,

CHRISTIAN MEDICAL and DENTAL
ASSOCIATION, on behalf of its members,
and

AMERICAN ASSOCIATION OF PRO-LIFE
OBSTETRICIANS AND
GYNECOLOGISTS, on behalf of its
members,

                 Defendant-Intervenors.

_____/

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## DEFENDANT-INTERVENORS' MOTION TO DISMISS

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................ii

**STATEMENT OF THE ISSUES PRESENTED** .....................................v

**CONTROLLING OR MOST APPROPRIATE AUTHORITY** ..........................vi

**INTRODUCTION**...........................................................................1

**ARGUMENT** ................................................................................2

  **I.   PLAINTIFFS HAVE STANDING**................................................3

  **II.   FEDERAL LAW REQUIRES HOSPITALS TO PROVIDE
STABILIZING ABORTIONS TO WOMEN EXPERIENCING
EMERGENCY PREGNANCY COMPLICATIONS**..........................10

  **III.   NONE OF THE FEDERAL AND STATE REFUSAL STATUTES
CITED BY DEFENDANT-INTERVENORS PRECLUDE PLAINTIFFS'
CLAIMS**................................................................................12

    A.   The Federal Refusal Provisions Do Not Repeal Hospitals' Obligations
Under EMTALA and the RA ................................................12

    B.   The State Refusal Provisions Cannot Preempt Plaintiffs' Rights Under
Federal Law .....................................................................18

  **IV.   RFRA DOES NOT APPLY IN SUITS BETWEEN PRIVATE
PARTIES** ...............................................................................21

**CONCLUSION**..............................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arizona v. United States*, 132 S. Ct. 2492 (2012) ....................................................19

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979) .................7

*Blanchette v. Connecticut General Insurance Corporations*, 419 U.S. 102
    (1974) ..............................................................................................................17

*California v. United States*, No. 05-00328, 2008 WL 744840 (N.D. Cal. March 18,
    2008) ...............................................................................................................14

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .....................................................4

*Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013).........................5, 6

*Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir. 1990)..........10

*Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir.
    2008) .............................................................................................................5, 7

*Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576 (6th Cir. 2014).................8

*General Conference Corporation of Seventh-Day Adventists v. McGill*, 617 F.3d
    402 (6th Cir. 2010)..........................................................................................21

*Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785 (6th Cir. 2015)................................3

*Haywood v. Drown*, 556 U.S. 729 (2009) ...............................................................19

*Helms v. McDaniel*, 657 F.2d 800 (5th Cir. Unit B 1981) .......................................19

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ................................................................19

*Kardules v. City of Columbus*, 95 F.3d 1335 (6th Cir. 1996)....................................9

*Laborers' Local 265 Pension Fund v. iShares Trust*, 769 F.3d 399 (6th Cir.
    2014) ................................................................................................................3

*Morin v. Eastern Maine Medical Center*, 779 F. Supp. 2d 166 (D. Me. 2011) ........7

*National Assocation of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ............................................................................................... 17, 18

*Owens v. Nacogdoches County Hospital District*, 741 F. Supp. 1269 (E.D. Tex. 1990) .................................................................................................7

*Parsons v. U.S. Department of Justice*, 801 F.3d 701 (6th Cir. 2015) .....................3

*Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133 (9th Cir. 2002) ...................8

*Public Citizen v. Federal Trade Commission*, 869 F.2d 1541 (D.C. Cir. 1989) .......7

*Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004) ...............................................................................................5, 7

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) ......................................17

*Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978).........................................18

*Ter Beek v. City of Wyoming*, 846 N.W.2d 531 (2014) ...........................................21

*United States v. Locke*, 471 U.S. 84 (1985).............................................................17

*United States v. Will*, 449 U.S. 200 (1980).............................................................18

**Federal Statutes**

29 U.S.C. § 794.........................................................................................................11

42 U.S.C. § 1395dd........................................................................................ 10, 11, 19

42 U.S.C. § 18023 ........................................................................................... 12, 16

42 U.S.C. § 238n............................................................................................ 12, 13, 15

42 U.S.C. § 300a-7 ....................................................................................................13

Public Law No. 112-74, § 507(d) .............................................................................13

iii

**State Statutes**

745 Illinois Compiled Statutes § 70/9........................................................................20

Iowa Code § 146.1 ...................................................................................................20

Michigan Compiled Laws § 333.1111......................................................................20

**Federal Regulations**

73 Federal Register 78,072–01 (Dec. 19, 2008).....................................................16

76 Federal Register 9,968–02 (Feb. 23, 2011) ................................................ 15, 16

**Other Authorities**

142 Congressional Record S2264 (March 19, 1996)...............................................15

150 Congressional Record H10087-02 (Nov. 20, 2004) .........................................14

151 Congressional Record H176-02 (Jan. 25, 2005)...............................................14

iv

## STATEMENT OF THE ISSUES PRESENTED

1.  Whether the Plaintiff organizations have alleged sufficient facts to establish Article III standing to sue for declaratory and injunctive relief against Defendants' policy of prohibiting abortions, even in emergencies, on behalf of their thousands of members, including:

  (a) at least one woman who was pregnant at the time the case was filed, had a history of disabling pregnancy complications that required the directly intended termination of her pregnancy, was harmed during a previous pregnancy by Defendants' refusal to provide stabilizing treatment for her emergency pregnancy complications due to the challenged policy, and lives in a county where the only hospital is operated by Defendants; and

  (b) other women who are currently pregnant, have been pregnant in the past, or will be pregnant in the future, some of whom will experience pregnancy complications, and who rely on Defendants' hospitals for emergency care.

2.  Whether the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, and the Rehabilitation Act (RA), 29 U.S.C. § 794, permit, or even require, hospitals to deny stabilizing treatment to a woman experiencing emergency pregnancy complications.

3.  Whether federal and state refusal statutes excuse Defendants from complying with EMTALA and the RA.

4.  Whether the federal Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, exempts Defendants from complying with EMTALA and the RA.

### <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>
### <u>FOR RELIEF SOUGHT</u>

The Table of Authorities includes a full listing of the authorities cited in this brief. The most directly applicable authorities are:

*California v. United States*, No. 05-00328, 2008 WL 744840 (N.D. Cal. March 18, 2008)

*Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008)

*General Conference Corporation of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010)

*Haywood v. Drown*, 556 U.S. 729, 736 (2009)

*Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004)

76 Federal Register 9,968–02 (Feb. 23, 2011)

## **INTRODUCTION**

Plaintiffs do not seek an order from this Court forcing individual physicians, such as Defendant-Intervenors' members, to provide life- or health-saving care to pregnant women. Yet Defendant-Intervenors, on behalf of such physicians, seek a ruling that would allow Defendants (Trinity Health and Trinity Health – Michigan) to *prohibit even willing physicians* from providing emergency care to pregnant women experiencing miscarriages or other serious complications—women carrying wanted pregnancies who suffer unexpected complications that put their life or health at risk. Fortunately for the many women who come to Defendants' emergency rooms each year, Defendant-Intervenors fail to cite any authority that could justify such far-reaching—and dangerous—precedent.

Indeed, most of the issues raised by Defendant-Intervenors' Motion to Dismiss have already been addressed, at length, in previous briefing and argument before this Court. Defendant-Intervenors shed no new light on these issues. First, the few standing cases they cite are entirely inapposite to the circumstances at issue here. Second, in an attempt to avoid the plain language of EMTALA and the RA, they unsuccessfully propose a series of strained interpretations of those and numerous other federal laws that flout basic canons of statutory construction. Third, they similarly invoke a litany of state laws, none of which can preempt

1

Plaintiffs' rights under federal law. Finally, they persist in arguing that RFRA bars Plaintiffs' claims, in complete disregard of binding Sixth Circuit authority.

More fundamentally, Defendant-Intervenors gloss over the serious issues at stake in this case when they suggest that it is merely about Plaintiffs' "general interests in 'public health' for women." Def.-Intervenors' Motion to Dismiss ("Motion to Dismiss II") at 13. While Plaintiffs are deeply concerned about women's health and wellbeing, this case is more specific than that. Namely, this case is about a specific policy that requires all hospital staff to withhold stabilizing abortions from women experiencing emergency pregnancy complications, in violation of federal law; it is about the numerous women who have already suffered severe physical harm as a result of this policy; and it is about at least one of Plaintiffs' pregnant members who, having already suffered because of this policy, lived under the threat of again being denied essential emergency care throughout her most recent pregnancy. As Plaintiffs have already argued, federal law prohibits Defendants from continuing to inflict these harms on Plaintiffs' members and other pregnant women. Accordingly, and for the reasons set forth below, Defendant-Intervenors' Motion to Dismiss should be denied.

## ARGUMENT

Courts considering a motion to dismiss must "construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true."

*Laborers' Loc. 265 Pension Fund v. iShares Trust*, 769 F.3d 399, 403 (6th Cir. 2014). Thus, a plaintiff need only "plead sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 792 (6th Cir. 2015) (internal citations omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (internal citations omitted).

## I.    PLAINTIFFS HAVE STANDING.

As Plaintiffs explained in their Opposition to Defendants' Motion to Dismiss ("Motion to Dismiss I"), they have standing to challenge Defendants' policy of preventing physicians at their hospitals from performing the directly intended termination of previability pregnancies even in emergency circumstances. Opp. Mot. to Dismiss I at 5–13. Plaintiffs have more than plausibly alleged that Defendants' policy directly imminently threatened at least one of Plaintiffs' members with substantial injury at the time this case was filed, that Defendants' policy by its own terms directly causes this injury, and that preventing Defendants from enforcing this policy would lift the threat posed to Plaintiffs' pregnant members seeking emergency care at Defendants' hospitals.

3

Defendant-Intervenors add nothing new to this discussion. They cite a few additional cases on standing, but these cases are inapposite. For example, relying on the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), Defendant-Intervenors argue that Plaintiffs' asserted injury is too "hypothetical" to establish standing for injunctive relief. Mot. to Dismiss II at 5. In *Lyons*, the Supreme Court held that a man subjected to an allegedly unconstitutional chokehold during a traffic stop lacked standing for prospective relief, because he could not demonstrate a real and immediate threat that he would "again have an encounter with the police and that either he would illegally resist arrest or detention or the officers would disobey their instructions and again render him unconscious without any provocation." 461 U.S. at 106. In so holding, the Court observed that Lyons would have had standing for injunctive relief had he plausibly alleged "that the City ordered or authorized police officers" to administer unconstitutional chokeholds under circumstances that Lyons would likely again confront (such as during traffic stops). *Id.*

This is precisely the situation here. Plaintiffs have alleged that Defendants' policy on its face prohibits physicians from terminating previable pregnancies, even in emergencies. They have further alleged that a hospital official employed by Defendants has explicitly admitted that stabilizing abortions were withheld from women on several occasions, pursuant to this policy. *See* Am. Compl. ¶¶ 12, 40–

4

41. In addition, Plaintiffs have identified a member who was pregnant at the time the case was filed, who has a history of severe pregnancy complications putting her at greater risk of experiencing future pregnancy complications, and who lives in a county where the only hospital is owned and operated by Defendants. *Id. ¶¶* 38, 41–43, 66. In other words, Plaintiffs have identified an individual facing actual and imminent risk of concrete harm under Defendants' official, written policy. This showing is sufficient to establish Plaintiffs' associational standing under Article III. *See Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 573–74 (6th Cir. 2004); *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) ("To satisfy . . . associational standing, all that plaintiffs need to establish is that at least one member faces a realistic danger of having his or her [voting registration] application rejected due to a mistaken mismatch.").

Defendant-Intervenors' reliance on *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013), to argue that Plaintiffs' claims are not sufficiently "imminent" is similarly misplaced. Mot. to Dismiss II at 6. In *Clapper*, the Supreme Court held that the plaintiffs lacked standing to challenge Section 702 of the Foreign Intelligence Surveillance Act of 1978, because their complaint relied on a "speculative chain of possibilities," including that: (1) plaintiffs' foreign contacts would be targeted for surveillance; (2) the government would specifically seek to use Section 702-authorized surveillance to target plaintiffs' foreign

5

contacts; (3) the Foreign Intelligence Surveillance Court would authorize the government's request to use such surveillance; (4) the government would succeed in obtaining the communications of plaintiffs' foreign contacts; and (5) plaintiffs' own communications with their foreign contacts would be swept up in such surveillance. 133 S. Ct. at 1148–50. According to the Court, this did "not establish that injury based on potential future surveillance [was] certainly impending or fairly traceable to [Section 702]." *Id.* at 1150. Defendant-Intervenors stretch this holding to argue that Plaintiffs' alleged injuries are not sufficiently "immediate," because Plaintiffs have not identified a specific member who is *currently* experiencing an emergency pregnancy complication that will require Defendants to perform a stabilizing abortion. Mot. to Dismiss II at 6.

But this case does not involve a "speculative chain of possibilities" like the ones at issue in *Clapper*. To the contrary, Plaintiffs have identified a member who was denied a stabilizing abortion by Defendants' hospital when she previously experienced emergency pregnancy complications, who relies on Defendants' hospital for care, who was pregnant at the time the case was filed, who has a history of disabling pregnancy complications (which increases her risk of future pregnancy complications), and who accordingly faced an imminent risk of harm during her pregnancy. Although no woman can predict in advance whether she will suffer a miscarriage, the law does not require as much; it is sufficient that the threat

6

of harm to Plaintiffs' pregnant member at the time this case was filed, as well as

the harm to Plaintiffs' other pregnant members in states where Defendants operate

hospitals, was personal, concrete, and directly attributable to Defendants' policy.

*See Browning*, 522 F.3d at 1163; *accord Blackwell*, 387 F.3d at 574; *see also*

*Public Citizen v. FTC*, 869 F.2d 1541, 1552 (D.C. Cir. 1989) (holding that

plaintiffs had membership standing to challenge regulations exempting certain

products from warning label requirements) ("In this case, it is not necessary for us

to know the names of injured persons in order to be assured beyond any reasonable

doubt that they exist, and that the organizations to which they belong may pursue

this action on their behalf.").

Indeed, the principle that "one does not have to await the consummation of

threatened injury to obtain preventive relief," *Babbitt v. United Farm Workers*

*Nat'l Union*, 442 U.S. 289, 298 (1979), applies with particular force to the claims

at issue here. In adjudicating EMTALA claims, "courts have generally rejected the

defense argument that the statute does not authorize injunctive relief for a person

who seeks treatment sporadically, including specifically for women who are no

longer pregnant by the time the court is able to act." *Morin v. E. Me. Med. Ctr.*,

779 F. Supp. 2d 166, 180 (D. Me. 2011); *see also, e.g.*, *Owens v. Nacogdoches*

*Cty. Hosp. Dist.*, 741 F. Supp. 1269, 1280 (E.D. Tex. 1990) ("Given that the

wrongs sought to be addressed by [EMTALA] are precisely not continuing but

7

episodic, since that is the nature of emergency medical conditions and of childbirth, it simply does not make sense to assert that [plaintiff] ceased to have standing for equitable relief when she gave birth. To so hold would render the inclusion of equitable relief in the statute mere surplusage.").

Likewise, the Sixth Circuit recently recognized that "a plaintiff demonstrates the requisite threat of future injury [for disability discrimination claims] where he establishes . . . that he would return, but is deterred from visiting the noncompliant accommodation because of the alleged accessibility barriers." *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 580 (6th Cir. 2014) (attached hereto as Exhibit A); *see also Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1135 (9th Cir. 2002) ("[W]hen a plaintiff who is disabled within the meaning of the ADA has actual knowledge of illegal barriers at a public accommodation to which he or she desires access, that plaintiff need not engage in the 'futile gesture' of attempting to gain access in order to show actual injury during the limitations period."). Plaintiffs have made comparable allegations here. Defendants have a clear policy that prohibits the provision of stabilizing abortions to women experiencing emergency pregnancy complications, and Plaintiffs have identified a member who: was denied necessary care as a result of that policy; was pregnant again when this case was filed; and reasonably feared she would once again be unable to obtain necessary care as a result of the policy. Am. Compl. ¶¶ 41, 43, 64. Given all this,

8

Plaintiffs' member did not need to wait until Defendants' hospital again denied her treatment for a pregnancy-related emergency in order to obtain prospective relief. If anything, Plaintiffs' case is made stronger by the unplanned, spontaneous nature of emergency hospital visits and the lack of emergency care alternatives.

Finally, Defendant-Intervenors inaccurately compare this case to the Sixth Circuit's decision in *Kardules v. City of Columbus*, 95 F.3d 1335 (6th Cir. 1996). Mot. to Dismiss II at 4–5. There, the plaintiffs claimed that the defendants unconstitutionally diluted their voting power over a proposed merger between a village and an unincorporated township, by threatening to raise utility rates tenfold if the merger went through. 95 F.3d at 1339. The Sixth Circuit held that the plaintiffs lacked standing, in part because the plaintiffs alleged only that the challenged rate increases—which were otherwise lawful—could somehow improperly "distort the political landscape surrounding the merger proposal in a constitutionally significant way," without any precise articulation of how the plaintiffs' voting power would be harmed. *Id.* at 1349–51. Here, by contrast, the harms Plaintiffs allege—the denial of appropriate stabilizing care for emergency medical conditions—are concrete and directly attributable to Defendants' challenged policy of denying emergency abortions to women experiencing serious pregnancy complications. *See* Am. Compl. ¶¶ 12, 38, 40–43, 64, 66.

Accordingly, Plaintiffs have established standing to seek prospective relief to protect their members from the harm caused by Defendants' policy.

## II.   FEDERAL LAW REQUIRES HOSPITALS TO PROVIDE STABILIZING ABORTIONS TO WOMEN EXPERIENCING EMERGENCY PREGNANCY COMPLICATIONS.

As this Court is already aware based on prior briefing, EMTALA and the RA require hospitals to provide patients experiencing emergency pregnancy complications access to stabilizing care, including abortion. *See* Opp. Mot. to Dismiss I at 13–21; Am. Compl. ¶¶ 20–67. Defendant-Intervenors make two arguments in rebuttal, both of which are specious. First, Defendant-Intervenors suggest that because abortion is not specifically mentioned as an example of care required for "stabilization" under EMTALA, hospitals are under no obligation to provide such care. This argument is wholly without merit. EMTALA requires hospitals that accept Medicare funds to provide stabilizing treatment to patients experiencing emergency medical conditions, *without exception*. *See* 42 U.S.C. §§ 1395dd(b)(1); *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268 (6th Cir. 1990) (stating that, if a covered hospital determines that an individual has an emergency medical condition, it must "stabilize the medical condition before transferring (or discharging) a patient"). There is no more statutory basis for inferring an unwritten abortion exception to EMTALA's stabilizing treatment

10

requirement than there is for inferring a tracheotomy exception or a defibrillation exception.[1]

Defendant-Intervenors' second argument is even more extraordinary. Defendant-Intervenors argue not merely that EMTALA and the RA permit hospitals to deny stabilizing abortions to women experiencing emergency pregnancy complications, but that those statutes actually *require* hospitals to do so. Mot. to Dismiss II at 15–16. This argument is beyond the pale. The EMTALA language invoked by Defendant-Intervenors—which applies only to conditions on transfer, not to the stabilizing treatment requirement, *see* 42 U.S.C. §§ 1395dd(c)(1)(A)(ii), (c)(2)(A)—was meant to prevent hospitals from inappropriately transferring pregnant women in the midst of normal labor and delivery, not to single-out pregnant women in the midst of miscarriage and *deny* them stabilizing treatment. Similarly, nothing in the RA suggests that a pregnant woman's right to reasonable accommodation may be limited because of her fetus. *See* 29 U.S.C. § 794. Taken to its logical conclusion, Defendant-Intervenors' argument is essentially that in passing EMTALA and the RA, Congress affirmatively *banned* the provision of life- and health-saving abortion services at any entity receiving certain federal funds. In other words, that every life- and

---

[1] The same logic applies to the RA, which requires federally funded programs to provide reasonable accommodations for people with disabilities, and to provide disabled individuals with full access to the program recipient's services, without any plausible ground for inferring an abortion exception. *See* 29 U.S.C. § 794.

11

health-saving abortion currently provided at non-Catholic hospitals throughout the country is illegal. This is patently false. *See, e.g.*, 42 U.S.C. § 18023 (stating, in section covering special rules relating to abortion, that nothing in the Affordable Care Act "shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including [EMTALA]").

## III. NONE OF THE FEDERAL AND STATE REFUSAL STATUTES CITED BY DEFENDANT-INTERVENORS PRECLUDE PLAINTIFFS' CLAIMS.

Defendant-Intervenors further assert that a myriad of federal and state refusal laws preclude Plaintiffs' EMTALA and RA claims, but the quantity of statutes cited says nothing about their relevance to this case. In fact, none of the numerous statutes invoked by Defendant-Intervenors actually applies here.

### A. The Federal Refusal Provisions Do Not Repeal Hospitals' Obligations Under EMTALA and the RA.

Attempting to escape the plain terms of EMTALA and the RA, Defendant-Intervenors invoke a number of federal provisions authorizing religious refusals in a variety of different contexts. But these federal refusal provisions do not conflict with Defendants' obligations under EMTALA and the RA.

Defendant-Intervenors rely primarily on two federal refusal provisions: the Coats Amendment, 42 U.S.C. § 238n, and the Weldon Amendment, Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, § 507(d). The Coats Amendment states that "[t]he Federal Government . . . may not subject any health care entity to

12

discrimination on the basis that . . . the entity refuses to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions." 42 U.S.C. § 238n(a)(1). The Weldon Amendment, a spending rider attached to each Labor-Education-Health and Human Services appropriations bill since 2004, states that "[n]one of the funds made available in this Act may be made available to a Federal agency or program . . . [that] subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Pub. L. No. 112-74, § 507(d)(1).[2]

There is nothing in either the Coats Amendment or the Weldon Amendment to suggest that these laws were intended to apply to emergency medical care. As a federal district court held in adjudicating a dispute over whether the Weldon Amendment threatened a state law analogue to EMTALA, "[t]here is no clear indication, either from the express language of the Weldon Amendment or from a federal official or agency, that enforcing . . . the EMTALA to require medical

---

[2] Defendant-Intervenors also rely on the Church Amendments, 42 U.S.C. § 300a-7. As Plaintiffs explained in their Opposition to Defendants' Motion to Dismiss, the Church Amendments prohibit courts from ruling that an entity is obligated to provide abortions *because* it receives one of three specific federal funding streams. *See* Opp. Mot. to Dismiss at 21–22 (citing 42 U.S.C. § 300a-7(b)). Plaintiffs' EMTALA and RA claims are not predicated on receipt of these funds, and so the Church Amendments do not apply.

13

treatment for emergency medical conditions would be considered 'discrimination' under the Weldon Amendment if the required medical treatment was abortion-related services." *California v. United States*, No. 05-00328, 2008 WL 744840, at *4 (N.D. Cal. March 18, 2008) (attached hereto as Exhibit B). In fact, Representative Weldon himself stated that his Amendment was not intended to reach emergency abortions and that EMTALA requires critical-care health facilities to provide appropriate treatment to women in need of emergency abortions. *See* 151 Cong. Rec. H176-02 (Jan. 25, 2005) (statement of Rep. Weldon). He explained that the Amendment "ensures that in situations where a mother's life is in danger a health care provider must act to protect the mother's life," and noted that Congress had passed EMTALA to provide such protections. *Id*; *see also id.* ("The Hyde-Weldon Amendment is simple. It prevents Federal funding when courts and other government agencies force or require physicians, clinics and hospitals and health insurers to participate in *elective* abortions." (emphasis added)); *see also* 150 Cong. Rec. H10087-02, H10090 (Nov. 20, 2004) (statement of Rep. Weldon) ("The policy simply states that health care entities should not be forced to provide elective abortions . . . ."). The sponsor of the Coats Amendment—which focuses on physician training, not a hospital's obligations to its patients—has also made clear that the statute was never meant to interfere with emergency abortions. *See* 142 Cong. Rec. S2264, S2270 (March 19, 1996)

14

(statement of Sen. Coats in support of his Amendment) (stating that resident physicians "have the expertise necessary, as learned in . . . [non-abortion-related] training procedures, should the occasion occur and an emergency occur to perform that abortion"); *id.* at S2269 (same).[3]

Defendant-Intervenors' disingenuously attempt to rely on the Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws, 76 Fed. Reg. 9,968–02 (Feb. 23, 2011), to suggest that the current Administration has adopted an abortion exception to EMTALA and the RA. The opposite is true: These regulations were adopted precisely to refute the notion that the federal refusal provisions override hospitals' obligations under EMTALA. The U.S. Department of Health and Human Services promulgated these regulations to overturn "midnight" regulations adopted by the George W. Bush Administration, which dramatically expanded the scope of the Church, Coats, and Weldon Amendments to authorize extremely broad refusals to provide reproductive health

---

[3] Moreover, the Coats Amendment simply does not apply to a claim seeking relief against a hospital, as opposed to an individual physician. 42 U.S.C. § 238n(c)(2) (defining protected entities as "an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions"). Although Defendant-Intervenors have been permitted to intervene on behalf of their individual physician members, Plaintiffs have not sought—and will not seek— to amend their Complaint to seek injunctive or declaratory relief against these members. Instead, Plaintiffs claim only that EMTALA and the RA prevent Trinity Defendants' *hospitals* from prohibiting all physicians from providing stabilizing abortions to patients suffering emergency pregnancy complications.

care. *See* 73 Fed. Reg. 78,072–01 (Dec. 19, 2008). In response to commenters'
concerns that the Bush Administration's regulations could be interpreted to conflict
with EMTALA, by authorizing hospitals to deny stabilizing abortions for women
experiencing emergency pregnancy complications, the current Administration
"partially rescind[ed] the 2008 Final Rule." 76 Fed. Reg. at 9,973. In fact, far from
recognizing any legal authority for a hospital to refuse to provide emergency
abortion services, the current Administration observed that "entities must continue
to comply with their Title X, Section 330, EMTALA, and Medicaid obligations, as
well as the federal health care provider conscience protection statutes." *Id.* at
9,974. In other words, the federal regulations cited by Defendant-Intervenors were
adopted precisely so that they would not conflict with EMTALA's mandates.[4]

Even if it were not clear from the plain language, legislative history, and
interpretation of the federal refusal laws by the agency charged with their
enforcement that the federal refusal laws do not apply to emergencies, this Court
could not read an unwritten abortion exception into EMTALA and the RA. As
discussed above, there is simply no basis for inferring such an exception from the
statutes' plain terms. *See, e.g.*, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44,

---

[4] Similarly, Defendant-Intervenors invoke the Affordable Care Act's provision
prohibiting health exchange plans from discriminating against providers that refuse
abortion services, Mot. to Dismiss II at 11, even though the same section explicitly
states that nothing in the Act "shall be construed to relieve any health care provider
from providing emergency services as required by State or Federal law,
including [EMTALA]." 42 U.S.C. § 18023(d).

16

57 n.9 (1996) (stating that courts "cannot press statutory construction to the point of disingenuous evasion" (quoting *United States v. Locke*, 471 U.S. 84, 96 (1985)). Instead, this Court would have to conclude that the Coats and Weldon Amendments effectively amended EMTALA and the RA to include an abortion exception. Such post hoc amendments, known as "repeals by implication," are disfavored by courts and will not be presumed absent clear legislative intent to repeal or amend the earlier statute. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007) ("We will not infer a statutory repeal 'unless the later statute expressly contradict[s] the original act' or unless such a construction 'is absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at all." (alterations in original) (citation omitted)); *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 134 (1974) ("A new statute will not be read as wholly or even partially amending a prior one unless there exists a positive repugnancy between the provisions of the new and those of the old that cannot be reconciled." (internal quotation marks omitted)). Here, far from clearly expressing an intent to amend EMTALA and the RA, the legislative histories of the Coats and Weldon Amendments make plain that Congress has not *sub silentio* amended EMTALA and the RA to preclude the relief sought here.[5]

---

[5] Moreover, the doctrine disfavoring repeals by implication "applies with even *greater* force" to appropriations provisions, such as the Weldon Amendment. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) (emphasis in original). Thus, while

The remaining federal statutes cited by Defendant-Intervenors are, as they themselves must know, completely inapplicable to the claims at issue in this case. Mot. to Dismiss II at 10–11. Not a single one of these provisions concerns the provision of emergency medical care at hospitals receiving federal funds; many of them do not concern abortion at all, and the ones that do apply only in very discrete contexts. Contrary to Defendant-Intervenors' arguments, a law that, e.g., protects the rights of individuals to refuse to participate in federal executions, does not amend a law requiring hospitals to provide stabilizing medical treatment so that it excludes life- and health-saving abortions. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 662. That Defendant-Intervenors are able to cite twelve such irrelevant provisions adds nothing to their argument.

    B.  <u>The State Refusal Provisions Cannot Preempt Plaintiffs' Rights Under Federal Law.</u>

Defendant-Intervenors further contend that EMTALA and the RA should not be read to conflict with a number of state refusal laws. Mot. to Dismiss II at 14. But federal statutes are not interpreted to avoid conflicts with state law and Defendant-Intervenors cite no authority for the proposition that state statutes may control the construction of substantive provisions in federal law. To the contrary,

---

Congress may alter substantive legislation through an appropriations measure, its intent to do so must be quite clearly expressed. *United States v. Will*, 449 U.S. 200, 223 (1980). Nothing in the Weldon Amendment demonstrates such a clear congressional intent to override the plain terms of EMTALA and the RA.

state laws are preempted to the extent that they "stand[] as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress."

*Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (quoting *Hines v.*

*Davidowitz*, 312 U.S. 52, 67 (1941)). Thus, the question before this Court is simply

whether EMTALA and the RA require hospitals receiving federal funds to provide

stabilizing treatment, including abortion, to patients experiencing emergency

medical conditions. If so, the Supremacy Clause makes plain that state refusal laws

cannot abrogate Plaintiffs' rights under federal law. *See* Opp. Mot. to Dismiss I at

22–23; *Haywood v. Drown*, 556 U.S. 729, 736 (2009). Indeed, EMTALA

explicitly provides that it preempts any state law that "conflicts with a requirement

of this section." 42 U.S.C. § 1395dd(f); *see also Helms v. McDaniel*, 657 F.2d 800,

805–06 (5th Cir. Unit B 1981) (holding that Section 504 of the Rehabilitation Act

preempts conflicting state law).

There is no preemption issue in this case, however, because neither

EMTALA nor the RA is in actual conflict with the state laws cited by Defendant-

Intervenors. First, none of the cited state statutes expressly applies to stabilizing

abortions. In fact, some of these statutes—including the Michigan statute—include

exceptions for protecting public health and ensuring compliance with federal law.

*See* Mich. Comp. Laws § 333.1111 (stating that the law must be "liberally

construed for the protection of the health, safety, and welfare of the people of this

19

state," and must be construed "to achieve . . . consistency" with "applicable federal and state law"); 745 Ill. Comp. Stat. § 70/9 ("Nothing in this act shall be construed so as to relieve a physician or other health care personnel from obligations under the law of providing emergency medical care."); Iowa Code § 146.1 ("Abortion does not include medical care which has as its primary purpose the treatment of a serious physical condition requiring emergency medical treatment necessary to save the life of a mother.").

Second, these state laws merely authorize hospitals to refuse to provide abortions as a matter of state law. EMTALA, on the other hand, requires hospitals to provide patients experiencing emergency medical conditions with appropriate stabilizing treatment, including abortion, as a matter of federal law. Similarly, the RA requires hospitals to provide women experiencing disability-related pregnancy complications with the reasonable accommodations necessary to obtain full access to all necessary emergency services, including stabilizing abortions.

Thus, to the extent that a number of these state statutes may be read to authorize hospitals to refuse abortion services even in emergency circumstances, that merely means that those states would not hold Defendants liable under state law for refusing to provide stabilizing abortions. Defendants may still, however, be held liable under federal law. *See Ter Beek v. City of Wyoming*, 846 N.W.2d 531, 540 (2014) ("Section 4(a) simply provides that, under state law, certain individuals

20

may engage in certain medical marijuana use without risk of penalty. As previously discussed, while such use is prohibited under federal law, § 4(a) does not deny the federal government the ability to enforce that prohibition . . . . Granting Ter Beek his requested relief does not limit his potential exposure to federal enforcement of the CSA against him, but only recognizes that he is immune under state law . . . .").

## IV.   RFRA DOES NOT APPLY IN SUITS BETWEEN PRIVATE PARTIES.

Finally, Defendant-Intervenors argue that the federal Religious Freedom Restoration Act (RFRA) precludes Plaintiffs' claims under EMTALA and the RA. To the contrary, as Plaintiffs pointed out in their Opposition to Defendant-Intervenors' Motion to Intervene—and Defendants again inexplicably fail to mention—there is binding authority from the Sixth Circuit squarely holding that RFRA does not apply in disputes between private parties. *See Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) ("The text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party.").

## CONCLUSION

For the reasons set forth above, Defendant-Intervenors' Motion to Dismiss should be denied.

21

Dated: April 4, 2016

/s/ Brian Hauss

Brian Hauss*
Alexa Kolbi-Molinas
Brigitte Amiri
Jennifer Dalven
Alyson Zureick
American Civil Liberties Union
  Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2633
bhauss@aclu.org
akolbi-molinas@aclu.org
bamiri@aclu.org
jdalven@aclu.org
azureick@aclu.org

*Attorneys for Plaintiff American Civil
Liberties Union*

*Application for admission
forthcoming*

/s/ Brooke A. Merriweather-Tucker

Brooke A. Merriweather-Tucker (P79136)
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P48085)
Kary L. Moss (P49759)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6823
btucker@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org

Jennifer B. Salvatore (P66640)
Cooperating Attorney, American Civil
  Liberties Union Fund of Michigan
Nacht, Roumel & Salvatore, PC
101 North Main Street, Suite 555
Ann Arbor, MI 48104
(734) 663-7550
jsalvatore@nachtlaw.com

*Attorneys for Plaintiff American Civil
Liberties Union of Michigan*

22

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 4th, 2016, I electronically filed the foregoing document with the Clerk of the Court via the ECF system which will give notification of same to all parties of record.

/s/Alexa Kolbi-Molinas

April 4, 2016